Danny N. PENLEY, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 1282S469.

Supreme Court of Indiana.

April 15, 1987.

Terrence W. Richmond, Public Defender, Richmond, for appellant.

Linley E. Pearson, Atty. Gen., Cheryl L. Greiner, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

This case requires that we examine the circumstances under which the State may use evidence that a defendant has engaged in unrelated misconduct to prove that he is guilty of the crime for which he is on trial.

Danny Penley was convicted after trial by jury of rape, a class B felony, Ind.Code § 35–42–4–1 (1985 Burns Repl.), and burglary, a class B felony, Ind.Code 35–43–2–1 (1985 Burns Repl.). As a part of its evidence against Penley, the State presented testimony about assaults on five other women occurring at various times over a three-year period. Some of these incidents qualified for admission under recognized exceptions and others did not. Admission of the latter requires reversal.

### I. Evidence of Other Crimes

The State's evidence showed that on May 6, 1979, the twenty year old victim of the crime charged was alone at home in bed. She was awakened around 2:30 a.m. by a man, later identified as Penley, who had entered her bedroom. Penley spoke to her in a soft voice and told her it was "o.k.," that her mother knew he was there. When the victim became upset, he threatened her not to "get loud." He ordered her to dis-

robe and he put his finger in her vagina. He told her to touch his penis. Then, he pulled a knitted hat over his face and forcibly had intercourse with her. Before Penley left, he told her he would be back.

Next, the State was permitted to elicit testimony from the sister of the victim about a sexual assault committed against her by Penley approximately one month before the attack on the victim. The sister testified that she was alone at home on March 28, 1979, when a noise in the house awakened her sometime between 3 and 4 a.m. Penley came into her bedroom with a nylon stocking on his head, put his hand over her mouth and told her to "shut up." Then he said it was "o.k.," that her mother knew he was there. He put his finger in her vagina, but when he began to undo his pants, the sister told him she was epileptic and needed her medication. With that, Penley fastened his pants and left.

The mother of the victim also testified for the State. On May 14, 1979, one week after her daughter was raped, the mother was home alone. She was awakened by a sound about 3 a.m. and saw a man, whom she later identified as Penley, outside the window cutting the screen. She screamed at him to leave, and he walked around to the side of the house. Fearful he would come in the back entrance, she ran out the front door toward the street light. Penley ran up behind her, put his hand over her mouth and began dragging her. When a neighbor appeared, he threw her down, breaking her shoulder, and escaped into the woods.

Three other rape victims, each testified that Penley was the man who raped them. The trial court held the evidence of these crimes and of the attacks on the victim's mother and sister were admissible to prove identity under the so-called "common scheme or plan" rule. Penley challenges the court's ruling as to all five of these witnesses. We conclude that the court erred in allowing testimony about the attacks against the three other rape victims, but agree with appellee that the evidence of the attacks on the sister and mother was properly admitted.

The notion that the State may not punish a person for his character is one of the foundations of our system of jurisprudence. Evidence of misconduct other than that with which one is charged ("uncharged misconduct") will naturally give rise to the inference that the defendant is of bad character. This, in turn, poses the danger that the jury will convict the defendant solely on this inference.

Exceptions to this rule must be applied with caution. Evidence of uncharged misconduct is generally inadmissible if "its sole relevance is to show that the defendant's general character is bad and that he therefore has a tendency to commit crimes." *Schnee v. State* (1970), 254 Ind. 661, 662, 262 N.E.2d 186, 187. However, evidence of uncharged misconduct may often be admissible because it promotes a legitimate inference about some issue in the cause, notwithstanding its incidental revelation about the defendant's character. *Id.;* Imwinkelreid, *Uncharged Misconduct Evidence* § 3.

■ Where the identity of the perpetrator is in issue, the inference that the defendant committed the crime may be promoted in many ways which might incidentally reveal uncharged misconduct. Uncharged criminal activity may tend to reveal a motive for the charged crime, a plan or scheme to commit the crime, the defendant's preparation for the crime, his guilty knowledge of the crime, or that he was a member of a conspiracy to commit the crime. In this regard, Indiana case law is consistent with Rule 404(b) of the Federal Rules of Evidence:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.

It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ Applicable to the case at bar is another exception by which the State may attempt to prove the identity of the perpetrator of the offense being tried by show-

ing that an uncharged crime in which the defendant has been identified and the charged crime were committed with identical *modus operandi.* This exception has often been characterized by the phrase "common scheme or plan." *Henderson v. State* (1980), 273 Ind. 334, 403 N.E.2d 1088; *Porter v. State* (1979), 272 Ind. 267, 397 N.E.2d 269. However, this same phrase has also been applied to describe the exception permitting evidence of other criminal activity "to demonstrate the common plan or scheme of criminal activity from which the accused originated the charged crime." *Malone v. State* (1982), Ind., 441 N.E.2d 1339, 1346. Thus, as explained in *Malone:*

> The test to bring evidence of other offenses within the common plan or scheme exception is not whether the other offenses have certain elements in common with the charged crime, but whether the other offenses tend to establish a preconceived plan by which the charged crime was committed. The crimes must, therefore, be so related in character, time and place of commission as to establish some plan which embraced both the prior and subsequent criminal activity and the charged crime.

441 N.E.2d at 1347.

Thus, our cases recognize two branches of the "common scheme or plan" exception, the first permitting proof of identity by showing the defendant committed other crimes with identical *modus operandi,* and the second permitting proof of an uncharged crime as evidence of a preconceived plan which included the charged crime. Today we are concerned with the first branch of the "common scheme or plan" exception.

■ The State may prove identity by showing that the similarities between the two crimes are so strong and the method so clearly unique that it is highly probable that the perpetrator of both is the same person. This Court has recognized this exception to the general rule against use of evidence of uncharged criminal activity. *Malone,* 441 N.E.2d 1339. We require a strong showing that the different criminal actions were so similarly conducted that the method of conduct can be considered akin to the accused's signature. *Biggerstaff v. State* (1977), 266 Ind. 148, 361 N.E.2d 895. However, as Justice Pivarnik wrote for the Court "[T]he repeated commission of similar crimes is not enough to qualify for the exception to the general rule. The acts or methods employed must be so similar, unusual and distinctive as to earmark them as the acts of the accused." *Willis v. State* (1978), 268 Ind. 269, 272, 374 N.E.2d 520, 522; *see also, Williams v. State* (1981), 275 Ind. 434, 417 N.E.2d 328.[1]

■ The similarities between the attack on the victim and the attack on her sister sufficiently established a *modus operandi* to qualify the sister's testimony as admissible to resolve the issue of the identification of the victim's rapist. The attacks took place within a one-month period at approximately the same hour of the morning and in the same household. Penley used the very same words to the sisters: "It's okay, your mother knows I'm here." He began the two sexual assaults similarly; the outcomes were different only because the sister of the victim deceived Penley about her medical condition.

**1.** This exception differs from that which Indiana has recognized for the crimes of incest and sodomy. In those prosecutions, evidence of prior acts between the prosecutrix and the defendant which have occurred over a limited period has long been admissible in Indiana under a doctrine which has come to be known as "depraved sexual instinct." The theory had been that perpetrators sometimes succeed in such crimes through extended periods of increasing familiarity with the victim and that earlier acts are admissible because they ordinarily are part of a common scheme, understanding of which is necessary to make a deter-

mination of guilt or innocence on the act which is charged. *State v. Markins* (1884), 95 Ind. 464. This exception has also been applied to permit proof of "particular abnormal mental condition" as "circumstantial evidence of his motive and intent" in cases of deviant sexual conduct. *Kallas v. State* (1949), 227 Ind. 103, 83 N.E.2d 769. This rule applies only to sodomy or incest. *Cobbs v. State* (1975), 264 Ind. 60, 338 N.E.2d 632. Where other crimes are involved, only general exceptions such as common scheme or identification may be a basis. *Austin v. State* (1974), 262 Ind. 529, 319 N.E.2d 130. *Cf., Brackens v. State* (1985), Ind., 480 N.E.2d 536.

■ Although the admissibility of the evidence of the mother's attack could not rest upon similarities with the victim's attack, it was probative of Penley's plan or scheme to attack repeatedly members of the same household. The admissibility of the evidence about the sister's experience was admissible on this basis as well.

After all, he told the victim he would be back. He carried out this plan by returning to attack the mother. An Illinois court has explained this exception to the general ban on evidence of uncharged misconduct:

> The State (and, indeed, some of the authorities) have used "common design" and *"modus operandi"* interchangeably, but the concepts are quite distinguishable. A common design refers to a larger criminal scheme of which the crime charged is only a portion. *Modus operandi* means, literally, "method of working," and refers to a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer. (Citations omitted). A common design is frequently relevant to show the motive for the crime charged. *Modus operandi* is most useful in showing that the accused is the perpetrator of the crime charged.

*People v. Barbour* (1982), 106 Ill.App.3d 993, 999–1000, 62 Ill.Dec. 641, 646, 436 N.E.2d 667, 672.

The attacks on the other three rape victims, although similar in some respects to the charged crime, were not sufficiently similar to warrant their admission. The shared characteristics do not indicate one "signature" rapist.[2]

■ The first such rape occurred more than ten months after the victim's, and the only similarities between the two crimes are not distinctive: the attackers entered the victims' houses between 2 a.m. and 3 a.m. and they attempted to conceal their faces. In the victim's case he pulled down a knit mask after the attack began, and in this later case the attacker used a nylon stocking already on his head. Quite unlike

the principal attack, the later victim was threatened with a gun and forced into her kitchen. Her rapist said, "Where's your old man?" and referred to her "old man messin' with his (old lady)." He forced intercourse from behind. The trial on these charges ended with a hung jury.

■ The second other victim was raped eleven months after the charged crime. The rapist came into her house at 2:15 a.m., wore a mask which he lifted to kiss her and told her to feel his penis. Unlike the principal rape victim, this witness was threatened with a weapon. In this instance the rapist said, "Someone's with your husband," and did refer to the victim's "old man" and his "old lady." The attacker demanded oral sex, had intercourse from behind her, and attempted anal intercourse. This trial, too, resulted in a hung jury.

■ The third other victim was raped almost three years after the charged crime. This rapist came into her house at 2 a.m., kissed her, put a nylon stocking, not a knit mask, on his head, and, unlike the *modus operandi* used in the charged crime, took her away from the house and forced her into an abandoned automobile. He also forced oral sex.

■ Mere repetition of similar crimes does not by itself warrant admission of the evidence of those crimes under the *modus operandi* rule. In order for the *modus operandi* rule to serve its intended purpose, the inquiry must be, "Are these crimes so strikingly similar that one can say with reasonable certainty that one and the same person committed them?" Not only must the methodology of the two crimes be strikingly similar, but the method must be unique in ways which attribute the crimes to one person. Given the inherent similarities in all sex crimes, the common use of disguises, and the frequent late night or early morning timing of residential intrusions, we can not say that these attacks reveal a distinctive *modus operandi.* See, *e.g., People v. Geitz,* 138 Ill.App.3d 670, 93 Ill.Dec. 139, 485 N.E.2d 1349 (1985);

---

**2.** Neither does the evidence of the attacks upon the other three victims reveal a larger criminal design or plan as does the evidence of the sister's and mother's attacks.

*compare, People v. Houseton,* 141 Ill. App.3d 987, 96 Ill.Dec. 149, 490 N.E.2d 1354 (1986).

Although the admission of the evidence about Penley's attacks on later victims was error, not all error provides grounds for reversal. Accordingly, we must appraise the harm done. As we have had recent cause to state, it is always perilous to speculate about the effect this kind of error might have on a jury's verdict. *Patterson v. State* (1986), Ind., 495 N.E.2d 714.

■ We cannot conclude that the verdict was unaffected by the erroneously admitted testimony of three other rape victims who accused Penley. Although the jury heard the victim's testimony against Penley and unequivocal identifications in court by the sister and mother, the appropriate inquiry here is not whether this testimony would prevail over a claim of insufficiency. *Coates v. State* (1985), Ind.App., 487 N.E.2d 167. The victim, her sister and her mother each had at one point misidentified their attacker. During the police investigation, the victim had even specifically identified persons other than the defendant as her attacker. Under these circumstances, we cannot regard testimony by three other women charging rape as harmless. Because the State's case relied substantially on improper proof of three unrelated crimes, Penley did not receive a fair trial.

## II. Other Issues Affecting Further Proceedings

Two other claims asserted by Penley must be resolved in order to determine what further proceedings are appropriate.

*Prosecutorial Vindictiveness.* Penley was tried in Wayne Superior Court in December 1980 and April 1981 for earlier rapes. Each trial resulted in a hung jury and a mistrial. The instant rape charge had also been filed in Superior Court. After the two unsuccessful prosecutions for the earlier rapes, however, the State dismissed the charge which is the case at bar and refiled it in Wayne Circuit Court, adding the burglary count.

Penley claims the State's dismissal of one count in Superior Court and the refiling of two counts in Circuit Court after two unsuccessful prosecutions constituted prosecutorial vindictiveness and multiple and piecemeal prosecution, requiring reversal of his convictions.

Penley made a pre-trial motion to dismiss on these grounds, and a hearing was held. Deputy Prosecutor Hunyadi testified that he assisted Prosecutor Gerald Surface in the two unsuccessful prosecutions of Penley. After those trials ended in hung juries, the prosecutor's office reevaluated its strategy. They decided to transfer Penley's prosecution to another prosecutor, Douglas Van Middlesworth, who routinely practiced in Circuit Court.

■ The prosecutor testified that he decided to add the burglary count to this case in the hope that the jury would be less reluctant to convict if presented with a property violation in addition to the more emotionally charged rape count. Penley complains in his brief that the testimony at the hearing on the motions clearly indicates that the burglary charge was added to enhance the State's chances in obtaining a conviction against him. Of course, this motivation itself is perfectly permissible. Furthermore, "[A] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in the prosecution. An initial decision should not freeze future conduct.... [T]he initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution." *United States v. Goodwin,* 457 U.S. 368, 382, 102 S.Ct. 2485, 2493, 73 L.Ed.2d 74, 86 (1982).

The State's pre-trial action was presumptively valid, although a showing by Penley that the enhanced charges were a direct, unjustifiable, and vindictive penalty for his exercise of a procedural right would bar the conviction. *Id.* No such showing was made. Although the dismissal of one charge and the filing of two charges occurred after Penley received a bond reduction in Superior Court, the evidence most favorable to the trial court's ruling re-

vealed that the decision to dismiss and re-file was made before the bond reduction. Actual dismissal did not occur until two weeks later, during which time Penley could have and did not "bond out," as the court stated. Before a trial takes place, a defendant is expected to invoke myriad procedural rights that inevitably present an imposition to the prosecution. *Id.*, 457 U.S. at 381, 102 S.Ct. at 2493, 73 L.Ed.2d at 86. We will not presume vindictiveness, and Penley has not demonstrated its existence.

Penley's double jeopardy argument is misplaced. He was not twice placed in jeopardy for the present offense. His previous trials related to other rapes, and the dismissal of this charge and its subsequent refiling before jeopardy attached was permissible. *Dennis v. State* (1080), Ind.App., 412 N.E.2d 303.

*Destruction of Evidence.* Penley appeals the denial of his motion to dismiss in which he alleged the investigating police failed to collect and preserve material evidence. The essence of his argument is that the police did not investigate possible fingerprints and footprints at the various crime scenes.

This issue falls squarely within that presented in *Rowan v. State* (1982), Ind., 431 N.E.2d 805, in which this Court rejected Rowan's claim that the investigative "blunders" denied him a fair trial. Rowan was unable to point to specific evidence which was not taken or preserved. We stated, "His speculations about what might have existed do not offset the deference which must be given to the expertise of police officers in conducting the investigation." *Id.* at 819–20.

Penley has attempted to substantiate his allegations with reference to some of the victims' statements that they thought "good prints" were left at the scenes. The testimony from the police was that the prints left were either too smudged or on a type of surface not conducive to "lifting" procedures. They did not attempt to take other prints from surfaces which had been handled by the victims subsequent to the crimes. Penley's argument is weakened further by the fact that the only print found and lifted after the attack charged in this case was preserved by the police, introduced at trial, and was *not* Penley's print. He cannot show prejudice by the manner of the police investigation. *Id.*

The judgment of conviction is reversed and the cause remanded for a new trial.

DeBRULER and DICKSON, JJ., concur.

GIVAN, J., dissents with separate opinion in which PIVARNIK, J., concurs.

GIVAN, Justice, dissenting.

I respectfully dissent from the majority opinion in this case. I believe the majority places too stringent a restriction upon evidence of prior similar offenses. The other offenses allowed in evidence in this case were very similar to other offenses allowed in the case of *Watts v. State* (1950), 229 Ind. 80, 102–03, 95 N.E.2d 570, 579–80. In that case this Court reviewed the guidelines necessary for the introduction of prior crimes and held that evidence of six acts of rape or attempted rape occurring over a period of two and one-half years was admissible to show intent, motive, purpose, identification or common scheme and plan.

In the case at bar, the manner in which appellant is alleged to have accomplished the rapes or attempted rapes is clearly sufficient to support one or several of the above exceptions to the rule of inadmissibility.

I would therefore affirm the trial court.

PIVARNIK, J., concurs.